UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUE AXIS GLOBAL LTD & LONGBYTE INC,<br><br>         Petitioners,<br><br> -against-<br><br>ALOPEX ADVISORS, LLC,<br><br>         Respondent. | Case No.: |

**PETITION FOR AN ORDER OF ATTACHMENT IN AID OF ARBITRATION**

    Petitioners Blue Axis Global Ltd ("Blue Axis") and Longbyte Inc. ("Longbyte" and together, "Petitioners"), both part of a world-wide group of affiliated companies known as the Bixin Group ("Bixin"), through their attorneys, the Chelney Law Group PLLC, respectfully allege, as and for their Petition against Respondent Alopex Advisors, LLC ("Respondent" or "Alopex"), as follows.

**INTRODUCTION**

    1.  This is an action pursuant to Civil Practice Law and Rules §7502(c) and Rule 64 of the Federal Rules of Civil Procedure seeking an attachment in aid of an arbitration pending in the Hong Kong International Arbitration Centre (the "Hong Kong Arbitration") against Respondent Alopex. In that proceeding Petitioners seek to recover a US$4 million "Security Deposit" held by Alopex in its account at Bank of America in New York. Alopex is holding the "Security Deposit" as "Custodian" pursuant to a Letter of Engagement (the "LOE") between Blue Axis and Alopex.

2. As discovery in the Hong Kong Arbitration has shown, Alopex has no discernable source of funds other than the Security Deposit to satisfy an arbitral aware in Petitioners' favor.

3. Accordingly, to secure the expected arbitration award, Petitioners seek an order attaching the account containing the Security Deposit. Absent an attachment, the award will be rendered ineffectual within the meaning of CPLR 7502(c) because Alopex will have dissipated the Security Deposit and will not be able to satisfy the award.

4. Petitioners are part of the Bixin Group, which operates a global platform for cryptocurrency-related services.

5. Pursuant to the LOE, Bixin retained Alopex to provide certain services in connection with the development of a facility to mine Bitcoin or other cryptocurrency in the country of Iceland. Among other things, Alopex was responsible for procuring a power supply agreement with a local utility that met Petitioners' specifications.

6. In accordance with the LOE's terms, Alopex was also required to use the Security Deposit "to secure the Site" for the facility.

7. However, Alopex did not use the Security Deposit to "secure the Site." Instead, after the Iceland project hit an unanticipated snag, and without responding to Petitioners' queries concerning the deposit, Alopex transferred the Security Deposit out of escrow to its own account (#█████████9134) at Bank of America, in New York.

8. In the Hong Kong Arbitration, Petitioners will demonstrate that they are entitled to the return of the Security Deposit because Alopex has failed to perform its obligations, most notably, the critical obligation to procure a power purchase agreement meeting the specifications in the LOE. Section 2.8 of the LOE, as amended, expressly provides for the return of the Security Deposit if Alopex fails to satisfy its obligations.

9. Alopex's defenses in the Hong Kong Arbitration are unavailing. Alopex essentially claims that it "earned" the Security Deposit, despite failing to perform its obligations, and that the Security Deposit was "forfeit" because Petitioners did not comply with contractual obligations that were never triggered, and a made-up condition the parties did not actually include in the LOE.

## THE PARTIES

10. Petitioner Blue Axis is a company incorporated under the laws of the British Virgin Islands ("BVI") located at Craigmuir Chambers, Road Town, Tortola VG1110 in the British Virgin Islands.

11. Petitioner Longbyte is a Delaware corporation with a registered office located at 16192 Coastal Highway, Lewes, Delaware 19958.

12. Petitioners are part of a world-wide group of affiliated companies known as the Bixin group that are beneficially owned by Mr. Wu Gang, a citizen of the People's Republic of China.

13. Bixin was founded in 2014, originally as a crypto wallet provider based in Mainland China. It went on to become one of the pioneers in the fields of fintech and cryptocurrency.

14. In 2021, Bixin discontinued its operations in Mainland China and restructured its business to become a global platform for cryptocurrency-related services. Among its other ventures, Bixin has built and maintains a comprehensive service platform for digital assets that includes core functions such as cryptocurrency wallets, trading, and mining.[1]

15. Bixin formed the Petitioners to serve as the corporate vehicles for cryptocurrency mining projects.

---

[1] Additional information concerning Bixin may be found on its website, https://bixingroup.com/.

16.     Upon information and belief, Respondent Alopex is a New York limited liability company with offices at 430 Park Avenue, Floor 19, New York, New York 10022.  Alopex purports to provide advisory services in the area of project finance, specializing in structuring, M&A, strategy/development, and capital raising.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332, because the controversy is between citizens of a state and a foreign country, on the one hand, and another state, on the other hand, and the sum in controversy exceeds $75,000.

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b)(1) and 28 U.S.C. §1391(c)(2) because Respondent resides in this district.

## FACTUAL ALLEGATIONS

**A.  The Parties' Agreement**

19.     In 2021, Bixin began exploring a potential investment in the development of a cryptocurrency mining facility located in Iceland.  Such a project generally entails identifying and acquiring a site for the facility, procuring sufficient electricity to run equipment, and finally, installing computing equipment needed to mine cryptocurrency at the facility (the "Miners").

20.     Cryptocurrency mining is very energy intensive, so the key to a successful mining venture is the ability to obtain a reliable source of electricity at a price that makes mining profitable.

21.     With no operations or experience doing business in Iceland, Bixin required assistance navigating the Icelandic property and energy markets, as well as the Icelandic legal and regulatory environment.  For such assistance, Bixin turned to Alopex.

22.     The parties agreed that Alopex would provide consulting services to Bixin to facilitate Bixin's investment in a mining facility in Iceland.  In August 2021, Bixin, through its affiliate, Petitioner Blue Axis, entered into a contract (*i.e.*, the LOE) with Alopex, as of August 18,

2021, describing the terms under which Alopex would provide such services. A copy of the LOE is attached hereto as Exhibit A.

23. The agreement specified services to be provided by Alopex, including securing the "Physical Premises" for the Bixin's cryptocurrency mining "Facility" in Iceland (§§1.3.1, 1.3.3) and arranging for the provision of electricity to operate the cryptocurrency Miners at a maximum cost of US$30 per megawatt hour (§§1.3.5, 1.3.6, 2.3), among other services. In exchange for the provision of the services in the LOE, Alopex was to receive US$3 per megawatt hour of electricity Bixin purchased to operate the Miners, to be invoiced and paid monthly. Exhibit A at §§2.1, 2.2.

24. In Section 2.4 and 2.4.1 of the LOE, Bixin, through Petitioners, agreed to provide a US$4 million "Security Deposit" into an escrow account to "secure the Site" of the cryptocurrency mining facility, located at Bakkavegur 2, IS-640 Húsavík, Íceland. Exhibit A at §§1.3.3, 2.4.

25. The parties subsequently amended the LOE to, among other things, further specify conditions for the return of the US$4 million advanced by Bixin. A true and correct copy of Amendment 1 to the LOE, effective September 17, 2021, is attached hereto as Exhibit B.

26. In Section 2.7 of the LOE (as amended by Amendment 1), the parties contemplated that Bixin would "finalize initial agreements" with a contractor to construct the mining facility, "including a well-defined and timely schedule for commencement of construction and/or retrofitting of the Facility," but planned for the disposition of the Security Deposit if Bixin could not finalize those agreements. In that event, they agreed that Alopex could take custody of the Security Deposit, but that the transfer of the deposit from the escrow agent to Alopex "does not constitute a forfeiture of the Security Deposit." Section 2.7, provides as follows:

> ***If Bixin does not finalize initial agreements*** (to wit, a written, executed EPC contract with a local, Icelandic EPC partner including

a well-defined and timely schedule for commencement of construction and/ or retrofitting of the Facility) *for construction of the Facility within sixty (60) calendar days of commencement of payment of the cash Security Deposit, the cash Security Deposit described in §2.4.1 may be liquidated* by the escrow agent, at Alopex's sole election, *to Alopex. Alopex will then be the custodian of the Security Deposit* governed solely by this Agreement. If the Security Deposit is made in Bitcoin, this clause is irrelevant and deemed not in force. *For avoidance of doubt, this clause does not constitute a forfeiture of the Security Deposit.* (Emphasis added).

27. As "custodian" of the Security Deposit, Alopex "irrevocably and unconditionally guarantees the full amount of the Security Deposit" in Section 2.9 of the Letter Agreement.

28. Because cryptocurrency mining is so energy intensive, the viability of any mining project hinges on access to electricity at a price that allows Miners to operate at a profit. Thus, it was absolutely critical that Alopex procure an agreement with a power company with the capacity to provide the necessary electricity at the cost specified in the LOE.

29. A power purchase agreement was so important that Bixin was willing to pay Alopex US$4 million dollars to procure it. The parties made this clear in the amendment to Section 2.8 of the LOE, which provides that Alopex would not "earn" the $4 million Security Deposit unless it provided, among other things, a "definitive" agreement to purchase electricity that satisfied Bixin's requirements. In the event Alopex was unable to deliver such an agreement, within the time frame specified in the LOE, Alopex was required to return the Security Deposit to Bixin. Section 2.8 of the LOE provides as follows:

> Alopex represents that it shall provide for the following: (i) the services set forth in § 1.3 hereto; (ii) *a definitive written power purchase, power sublease, or similar agreement between Bixin and the power provider of the Facility by or within thirty (30) calendar days of confirmation of full payment of the cash Security Deposit (as section 2.4 in original LOE) as wired to the escrow account or Alopex*; (iii) the confirmation of delivery or capability of delivery by or within 90 days of the Effective Date of this Agreement the power requirements of Bixin (power at 400Y/230V

[400V 3-phase, 230V single phase]); (iv) such Power having cost as defined in §2.3 pursuant to a power purchase, power sublease, or similar agreement; and (v) a deposit requirement of Bixin for the power purchase agreement, sublease agreement, or similar agreement that will be equivalent to or no more than one month electricity bill be prepaid. ***In the event that any of the above are not timely satisfied, whether due to the fault of Alopex or an uncured Force Majeure Event greater than 180 (one hundred eighty) calendar days, the Security Deposit shall immediately be returned to Bixin.*** This clause is invalidated if Bixin negotiates with the Power Provider in bad faith, withholds documents, withholds cooperation, unduly delays its or Alopex's performance, and/or fails to provide Alopex with the requisite information or aid necessary to finalize a Power Purchase Agreement between Bixin and the Power Provider. (Emphasis added).

30. Consistent with Section 2.8, the parties also agreed to amend that section of the LOE that provided for the delivery of the Security Deposit to make clear that the deposit was not "deemed earned" by Alopex unless Alopex performed its obligations under Section 2.8. In Section 2.4.1 of the LOE, as amended, the parties agreed that "where Alopex has not performed [its obligations] under §2.8 … the deposit shall not be deemed as earned by Alopex." Section 2.4.1 provides as follows:

> Due Upon Signing. Immediately upon execution of this Agreement and a separate Escrow Agreement, Bixin will deposit $4,000,000.00 (four million US dollars) with a US-based, third-party escrow agent (the Escrow Agent) chosen by Alopex. Subject to the terms and conditions herein, this amount is immediately deemed earned by Alopex and is refundable solely in according to the terms in §2.4.6 and §2.8. Notwithstanding anything to the contrary in the prior sentence, where Bixin has satisfied it obligations under §2.4.6, any amounts due as a construction return deposit to Bixin shall not be deemed as earned by Alopex, and (ii) ***where Alopex has not performed under §2.8*** or where there is a Force Majeure Event under §2.8, ***the deposit shall not be deemed as earned by Alopex.*** (Emphasis added).

31. In Section 2.4.5 of the LOE, the parties also provided for the return of the Security Deposit "at Bixin's election, to be made in writing to Alopex," in accordance with the "schedule" outlined in that section. Section 2.4.5 states:

7

> *Construction Return of Deposit.* ***At Bixin's election, to be made in writing to Alopex, the return of Security Deposit may instead follow the hereunder schedule***: (a) upon Bixin's cumulative Facility investment (net of liens, encumbrances, or obligations to third-parties) in the construction of the Facility (the Facility Investment) of $5,000,000.00 (five million US dollars), Alopex shall return an amount equal to the lesser of $500,000.00 (five hundred thousand US dollars) or B13.75 (thirteen and 75/100 Bitcoin); (b) upon Bixin's cumulative Facility Investment of $10,000,000.00 (ten million US dollars), Alopex shall return an additional amount equal to the lesser of $1,500,000.00 (one million, five hundred thousand US dollars) or B41.25 (forty-one and 25/100 Bitcoin); and (c) upon Bixin's cumulative Facility Investment of $15,000,000.00 (fifteen million US dollars) or greater, Alopex shall return an additional and final amount equal to the lesser of $2,000,000.00 (two million US dollars) or B55.00 (fifty-five Bitcoin). (d) Additionally, if the Facility's completion and installation of the Miners predates the return hurdles described above in this clause, any remaining Security Deposit shall be returned to Bixin.

32. Section 2.4.6, as amended by Amendment 1, provided that if Bixin elected to follow the "schedule" for the return of the Security Deposit specified in Section 2.4.5, it had to satisfy certain conditions. Section 2.4.6 also reiterated the parties' agreement that Alopex would return the Security Deposit in the event it was unable to perform its obligations under Section 2.8. Section 2.4.6 states:

> Construction Return of Deposit Requirements. ***If Bixin elects to follow the §2.4.5***, schedule, Bixin agrees that: (a) all Facility Investment must be reasonably documented and available for Alopex's review upon request; (b) in the event that Bixin fails to adequately meet the stated delivery deadlines, fails in its contractual duties for installation, materially breaches this Agreement or the NDA (§4.1), terminates this Agreement, and/ or causes Alopex to terminate this contract for non-performance or Bixin's default, the full Security Deposit will be non-returnable. ***Notwithstanding any above, in the event of Alopex's breach of §2.8 of this Engagement or the NDA, Alopex shall have no claim or right to the Security Deposit and the Security Deposit shall be immediately returned to Bixin.*** (Emphasis added).

8

33. Section 2.10 of the Letter of Agreement specified the conditions under which Bixin would "forfeit" the Security Deposit, echoing Section 2.4.6, as amended. Section 2.10 states:

> <u>Forfeiture of Deposit</u>. If Bixin fails to adequately meet the stated delivery deadlines, fails in its contractual duties for installation, materially breaches this Agreement or the NDA (§4.1), terminates this Agreement, and/ or causes Alopex to terminate this contract for non-performance or Bixin's default—notwithstanding the provisions under §2.4.6—Bixin will forfeit all rights and claims to the Security Deposit to Alopex. If such delay in performance lasts more than ten (10) business days, Alopex reserves the right to terminate this Agreement immediately by written notice.

34. Alopex approved an assignment of Blue Axis's rights and obligations under the LOE to another Bixin affiliate, Petitioner Longbyte. A true and correct copy of that approval is attached hereto as Exhibit C.

### B. <u>Petitioner Longbyte Advances US$4 million to "Secure the Site" of the Crypto-Mining Facility</u>

35. Subsequent to the LOE and Amendment 1, the parties entered into a Confidential Escrow Agreement with Whitelock & Associates, P.A., as Escrow Agent.

36. Bixin, through Petitioner Longbyte, then wired or caused to be wired $4 million to the Escrow Agent pursuant to the terms of the LOE.

37. On October 14, 2021, the Escrow Agent confirmed the wires, affirming that "four (4) wires [totaling $4 million] have all cleared and are currently held in the Trust Account pursuant to the Escrow Agreement." A true and correct copy of the confirmations is attached as Exhibit D.

### C. <u>Alopex Breaches the LOE</u>

38. The LOE, as amended, obligated Alopex to provide Petitioners with "a definitive written power purchase, power sublease, or similar agreement between Bixin and the power provider of the Facility [a "Power Agreement"] by or within (30) calendar days of confirmation of full payment of the case Security Deposit…." Exhibit B at §2.8(ii).

9

39.     The contractual deadline for Alopex to provide the Power Agreement was November 13, 2021.  Alopex failed to meet that deadline and never provided a "definitive" Power Agreement , as required under Section 2.8 of the LOE.

40.     The LOE, as amended, obligated Alopex to provide "the confirmation of delivery or capability of delivery by or within 90 days of the Effective Date of this Agreement the power requirements of Bixin (power at 400Y/230V [400V 3-phase, 230V single phase]); (iv) such Power having cost as defined in §2.3 pursuant to a power purchase, power sublease, or similar agreement; and (v) a deposit requirement of Bixin for the power purchase agreement, sublease agreement, or similar agreement that will be equivalent to or no more than one month electricity bill be prepaid." Exhibit B at §2.8(iii)-(v).

41.     Alopex failed to provide these deliverables as well.

42.     Section 2.8 of the Letter Agreement, as amended, further provides that "In the event that ***any of the above [obligations] are not timely satisfied***, whether due to the fault of Alopex or an uncured Force Majeure Event greater than 180 (one hundred eighty) calendar days, ***the Security Deposit shall immediately be returned to Bixin***." *Id.* at §2.8 (emphasis added).

43.     Notwithstanding demands from Bixin, through Petitioners, to return the Security Deposit advanced to the "secure the Site," Alopex has refused to return the Security Deposit.

**D.  After Alopex Failed to Secure a "Definitive" Written Power Purchase Agreement by the Deadline Specified in the LOE, the Iceland Project Was Negatively Impacted By Alopex's Failure to Facilitate Opening of an Icelandic Bank Account for Bixin's Local Affiliate**

44.     Bixin and its affiliates, including Petitioner Longbyte, were previously able to satisfy the onboarding processes to set up bank accounts in several other major jurisdictions – including the United States and Singapore.

45.    To set up the necessary corporate entities and bank accounts in Iceland, Alopex introduced Bixin to Advel Attorneys ("Advel"), an Iceland law firm. Alopex represented that Advel was one of the leading law firms in Iceland and that it would guide Bixin in setting up the necessary corporate entities and bank accounts in Iceland.

46.    As it turned out, Alopex and its recommended advisor failed to facilitate opening a bank account for Bixin's affiliate in Iceland. Whether this was due to their inexperience and incompetence, the Icelandic banks' unwillingness to take on risks associated with the cryptocurrency industry, or some other factor is unclear.

E.    **Alopex Secretly Liquidates the Security Deposit**

47.    Section 2.7 of the LOE provides, in relevant part, that "If Bixin does not finalize initial agreements … for construction of the Facility within sixty (60) calendar days of commencement of payment of the cash Security deposit, the cash Security Deposit described in §2.4.1 may be liquidated by the escrow agent, at Alopex's sole election, to Alopex. Alopex will then be the custodian of the Security Deposit governed solely by this Agreement. … For avoidance of doubt, this clause does not constitute a forfeiture of the Security Deposit." Exhibit B.

48.    Because of Alopex and Advel's failure to successfully guide Bixin through the process of opening an Icelandic bank account for its local affiliate, Bixin was unable to finalize agreements to construct the mining facility with an Icelandic contractor.

49.    On or around February 8, 2022, Alopex liquidated the Security Deposit advanced by Longbyte, taking custody of the funds pursuant to Section 2.7 of the LOE, as amended. As provided in that section, the liquidation of the Security Deposit did "not constitute a forfeiture" of the deposit. Rather, Alopex became the "custodian" of the deposit and, as custodian, guaranteed repayment of the Security Deposit to Bixin.

50. The LOE, as amended, obligated Alopex, among other things, to use the US$4 million Security Deposit to "secure the Site" of the cryptocurrency mining Facility. Exhibit A at §§1.3.1-1.3.3, 2.4; Exhibit B at §2.8(i).

51. Alopex did not use the $4 million to "secure the Site" of the Facility, as required by Section 2.4 of the LOE.

52. Moreover, Alopex concealed the fact that it had withdrawn the Security Deposit from escrow. On March 3, 2022, Bixin's representative reached out to Mr. Matthew Czinger, Alopex's principal, to inquire about the status of the Security Deposit. When Mr. Czinger responded, two weeks later, he ducked the question. Bixin did not find out until much later that Alopex had surreptitiously taken custody of the Security Deposit.

F. **Longbyte Commences an Arbitration in Hong Kong**

53. On April 13, 2023, Petitioner Longbyte commenced the Arbitration administered by the Hong Kong International Arbitration Centre pursuant to Section 8.6 of the LOE between the parties. That section provides that, "Any dispute, controversy, or claim arising out of or in connection with this contract, or the breach, termination, or invalidity thereof, shall be finally settled by arbitration administered by the Hong Kong International Arbitration Centre."

54. In accordance with Section 8.5 of the LOE, the parties' rights under the LOE are governed by Hong Kong law. Accordingly, the arbitrator will apply Hong Kong law to adjudicate the parties' dispute.

55. On June 1, 2023, Longbyte filed an Amended Notice of Arbitration adding Blue Axis, the nominal party to the LOE, as an additional claimant.

G. **All of Alopex's Defenses Are Meritless**

56. Alopex has asserted several defenses to Petitioners' claims in the Hong Kong Arbitration. First, Alopex claims that the Security Deposit was "immediately deemed earned" by

Alopex when Longbyte transferred the deposit into escrow. But, this is inconsistent with the plain terms of Section 2.4.1 of the LOE, as amended, which provides, in relevant part, that "where Alopex has not performed under §2.8 … the deposit **shall not be deemed earned** by Alopex."

57. Next, Alopex argues that Bixin's own failure to perform its obligations under the LOE prevented Alopex from securing a "definitive written power purchase, power sublease or similar agreement between Bixin and the power provider" pursuant to Section 2.8 of the LOE and that this entitled Alopex to forfeiture of the Security Deposit pursuant to Section 2.10. Specifically, Alopex claims that Bixin (1) "failed to meet stated delivery deadlines," (2) failed to meet its "contractual duties for installation," by not securing the "site" (or allowing Alopex to secure the site) for the Facility, and not installing the Miners and related equipment;  and (3) materially breached the LOE by failing to pass Know Your Customer ("KYC") process required to open an account at an Icelandic bank despite representing that it was able "to effectuate the Transaction." Although passing the KYC process and opening an Icelandic bank account are ***not*** conditions to Alopex's own performance, Alopex claims that such a condition should be implied.

58. All of these arguments are undermined by the express terms of the parties' agreement. First, the LOE does not contain any "stated delivery deadlines." The parties contemplated that such deadlines would be set when Bixin "finalized initial agreements" with an Icelandic contractor, "including a well-defined and ***timely schedule for commencement of construction and/ or retrofitting of the Facility***." *See* Exhibit B, at §2.7. As provided in the LOE, the fact that Bixin did not finalize such agreements did not constitute a forfeiture of the Security Deposit.

59. Second, Bixin did not breach and could not have breached its "installation" obligations. Securing the "Site" of the Facility was Alopex's responsibility, not Bixin's, and Bixin

13

provided Alopex the US$4 Security Deposit for that purpose pursuant to Section 2.4 of the Letter Agreement.  Moreover, there was no deadline for Bixin's obligation to deliver and install Miners on the Site because the prerequisites for such delivery never occurred.  Indeed, Bixin's obligations to deliver and install the Miners was never triggered because Alopex failed to "secure the Site" and Bixin did not finalize agreements with an Icelandic contractor to construct the Facility.

60.     Third, Section 1.4 of the Letter Agreement, which states that "Bixin has indicated to Alopex that Bixin (or any of its Affiliates) has an interest in and ability to effectuate the Transaction" does not impose Bixin's passing KYC and opening an account at an Icelandic bank as a condition precedent to the performance of Alopex's obligations under the Section 2.8.  The "Transaction" referenced in this provision is defined in Section 1.2 as "Bixin, potentially in syndication with another investor, investors, and/ or partners, will provide a minimum amount of mining units (the Miners) in order to utilize 85% of the available power provided under this Agreement and will deliver them to the Facility (§1.3.1), Alopex, or an Affiliate (§5.2) of Alopex, will provide the requisite Services (§1.3) for the operation of the Miners."  This section does not reference successful completion of the KYC process.

61.     Alopex has asked the arbitrators in the Hong Kong Arbitration to rewrite the parties' agreement to include successful completion of the KYC process and opening of an Icelandic bank account as a required precondition for the performance of Alopex's own obligations.

62.     As discussed at length in the accompanying affirmation of Petitioners' arbitration counsel, there is no basis in Hong Kong law to make up a term that the parties never contemplated and did not include in their agreement.  Indeed, the successful completion of the KYC process could not have been a pre-condition to the performance of Alopex's obligation to secure a

14

definitive power purchase agreement because the KYC process did not begin until after the deadline for Alopex to perform its obligation had already expired.

63. At all times Bixin negotiated in good faith, cooperated with Alopex, provided Alopex with all documents and information it requested, and did not cause any undue delays.

64. Because Alopex failed to perform its obligations under the LOE, as amended, and because Alopex's failure was not caused by Petitioners, Alopex is required to unconditionally return the $4 million Security Deposit advanced by Longbyte to "secure the Site" of the Facility.

H. **Absent an Attachment, an Arbitration Award in Petitioners' Favor Will Be Ineffectual**

65. Upon information and belief, Alopex has already dissipated or will dissipate the $4 million advanced by Longbyte to secure the Site of the Facility. Such dissipation will continue absent an attachment, rendering an eventual arbitration award in Petitioners' favor ineffectual within the meaning of CPLR §7502(c).

66. In a witness statement submitted in the Hong Kong Arbitration Matthew Czinger, Alopex's founder, states that Alopex "has sourced energy for energy intensive users—including the cryptocurrency industry going back to 2018" and "has consulted for private equity firms in Europe looking to acquire major energy assets and/or companies in Iceland."

67. Public records, however, show that Alopex has been starved of capital practically since its inception. In the second quarter of 2019, Alopex unsuccessfully sought $3,000,000 in financing for "working capital" at an interest rate of 13%. Alopex advanced $12,500 to a lender, Blue Clover LLC, to cover the cost of the loan's procurement. In early 2021, after Blue Clover failed to procure the loan, Alopex sued to recover its advance.

68. Other than the $4 million advanced by Longbyte in October 2021, Alopex appears to have had no other discernable source of income. Although Mr. Czinger claims that he "continue[s] to work on energy projects, which are located in Iceland," Alopex's website,

15

www.alopexadvisors.com, consists of a single page with Alopex's logo and contact information. There is no information about past or current clients or projects.

69. Alopex's Statement of Defense, submitted in the Hong Kong Arbitration, stated that Alopex "bet the company, timewise and opportunity-wise, on Bixin" confirming that at least until early 2023, when Alopex purported to terminate the LOE, Alopex had no other income producing projects.

70. As confirmation of Alopex's precarious financial position, based on a recent search of the New York State Department of State's State Tax Warrant Notice System, Alopex is the subject of outstanding New York State tax warrants, including a single warrant for over $13,262.89 in unpaid taxes.

71. Accordingly, there is a high probability that, absent an attachment of its account at Bank of America, Alopex will not be able to satisfy an arbitral award in Petitioners' favor for the $4 million Security Deposit, exclusive of interest and arbitration fees.

**PETITION FOR AN ORDER OF ATTACHMENT IN AID OF ARBITRATION PURSUANT TO FED. R. CIV. P. 64 AND CPLR 7502(c)**

72. Section 8.6 of the LOE provides for arbitration administered by the Hong Kong International Arbitration Centre.

73. On April 13, 2023, Petitioner Longbyte commenced the Hong Kong Arbitration pursuant to Section 8.6 of the LOE and Rule 4.1 of the Hong Kong International Arbitration Centre's Administered Arbitration Rules (the "HKIAC Rules") by delivering a Notice of Arbitration to the Hong Kong International Arbitration Center and Alopex in the manner required by the HKIAC Rules.

74. As provided in Section 8.5, the parties' rights under the LOE, as amended, are governed by Hong Kong Law. That section states, in relevant part, that the "validity,

interpretation, construction, and performance of this Agreement shall be governed and construed in accordance with Hong Kong law…."

75. Accordingly, the Notice of Arbitration asserts three separate causes, within the meaning of CPLR 7502(c) and 6212(a), for breach of contract, *Quistclose* trust, and unjust enrichment under Hong Kong law.

76. For the reasons discussed in Petitioners' Memorandum of Law in Support *Ex Parte* Order of Attachment (the "Memorandum of Law") and based on the declarations and evidence accompanying this Petition, Petitioners have met their burden to demonstrate probable success on the merits of its causes of action. Petitioners have shown that Alopex failed to fulfil its obligations under the LOE, specifically its obligations under Section 2.8, and refused to return the Security Deposit, as required by that section.

77. Alopex's asserted defenses in the Hong Kong Arbitration are meritless because they are either inconsistent with the express terms of the LOE, as amended, or otherwise unviable under applicable Hong Kong law. For example, Alopex's claim that the Security Deposit was "deemed earned" by Alopex is controverted by the express terms of LOE which states that the deposit was not "deemed earned" by Alopex unless it satisfied its obligations under Section 2.8. Alopex's claim that Bixin's breaches of the LOE excuse Alopex's failure to perform are also meritless.

78. Absent an order attaching the Security Deposit in Respondent's custody, an arbitration award in Petitioners' favor will be rendered ineffectual. Upon information and belief, Alopex has already dissipated or will dissipate the Security Deposit and has used it for purposes other than to "secure the Site" of the cryptocurrency mining facility as contemplated by the parties.

79. Because of its lack of any discernable source of income or assets, absent an order of attachment, Alopex will not be able to satisfy an arbitration award in Petitioners' favor. Public

records indicate that in mid-2019, Alopex unsuccessfully sought a $3 million loan for "working capital" to fund its operations. It was unable to obtain such a loan and (other than Petitioners' US$4 million Security Deposit) has had no other discernable source of revenue. Its website contains only a logo and a business address and does not disclose any current or future engagements or projects through which Alopex could earn revenue to fund its operations or satisfy an award. In its filings in the Hong Kong Arbitration, Alopex admits that it "bet the company" on Bixin's project in Iceland. Because that project has fallen through, it is unlikely that Alopex has the resources to satisfy an arbitral award in Petitioners' favor.

80. Confirming the precarious state of its finances, Alopex is the subject of outstanding New York State tax warrants.

81. Respondent has not asserted or identified any counterclaims against Petitioners. Thus, the US$4 million Security Deposit, which Petitioners seeks to recover in the Hong Kong Arbitration and to attach in this proceeding, exceeds all counterclaims known to Petitioners.

82. Petitioners accordingly seek an Order of Attachment in aid of the pending Hong Kong Arbitration, attaching Alopex's account at Bank of America, NA, (#█████████9134) up to the amount of, but no less than, Petitioners' US$4 million Security Deposit.

WHEREFORE, Petitioners respectfully request this Court, pursuant to Rule 64 of the Federal Rules of Civil Procedure and 7502(c), issue an Order directing attachment of Alopex's Bank of America account (#▇▇▇▇▇▇▇9134) up to the amount of US$4 million.

Dated: New York, New York
November 6, 2024

Respectfully submitted,

By: */s/ Stan Chelney*

Stan Chelney
Philipp Smaylovsky

CHELNEY LAW GROUP PLLC
28 Liberty Street, 6th Floor
New York, NY 10005
(212) 653-0024

*Attorneys for Petitioners*
*Blue Axis Global Ltd. and*
*Longbyte Inc.*