UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BLUE AXIS GLOBAL LTD &
LONGBYTE INC.,

                              Petitioners,

      -against-                                          Case No.:

ALOPEX ADVISORS, LLC,

                              Respondent.


## MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR TEMPORARY ORDER OF ATTACHMENT IN AID OF ARBITRATION

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

FACTUAL BACKGROUND ................................................................2

    I.     Petitioner Longbyte Advances US$4 million to "Secure the Site" of the Mining Facility................................................................5

    II.    Alopex Breaches the Letter of Engagement but Refuses to Return the Security Deposit................................................................5

    III.   After Alopex's Deadline to Secure a "Definitive Written Power Purchase … or Similar Agreement" Expired, the Iceland Project Is Negatively Impacted by Alopex's Failure to Facilitate the Opening of an Icelandic Bank Account for Bixin's Local Affiliate................................................................5

    IV.    Alopex Secretly Liquidates the Security Deposit ................................................................6

    V.    Petitioner Longbyte Commence an Arbitration in Hong Kong ................................................................7

ARGUMENT ................................................................8

    I.     Absent an Attachment, An Arbitration Award Will Be Ineffectual ................................................................9

    II.    Petitioners are Likely to Succeed on the Merits of their Claims in the Hong Kong Arbitration................................................................11

        A.  Petitioners are Likely to Prevail in the Hong Kong Arbitration Because the Express Terms of the LOE Require Alopex to Return the Security Deposit ................................................................12

        B.  Alopex's Contractual Defenses are Meritless................................................................14

        C.  There Is No Basis to Imply a Term Requiring Bixin to Complete the KYC Process and Open an Icelandic Bank Account as a Prerequisite to Alopex's Performance ................................................................18

        D.  Even Assuming the Contractual Conditions for Forfeiture of the Security Deposit Were Met, Those Provisions Would Not Be Enforceable Under Hong Kong Law ................................................................21

i

E.  Petitioners Are Entitled to Recover the Security Deposit Under the
    Equitable Doctrines of *Quistclose* Trust and Unjust Enrichment .................. 22

III.    The Amount Demanded in Arbitration Exceeds All Counterclaims ....................23

CONCLUSION .........................................................................................................................24

## Table of Authorities

**Cases**

*County Natwest Securities Corp. USA v. Jesup, Josephthal & Co.,*
   180 A.D.2d 468 (1st Dep't 1992) ................................................................ 10

*Habitations Ltd. v. BKL Realty Sales Corp.,*
   160 A.D.2d 423 (1st Dep't 1990) ................................................................ 10

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.,*
   306 F.Supp.2d 482 (S.D.N.Y. 2004) ........................................................... 11

*Mishcon de Reya New York LLP v. Grail Semiconductor, Inc.,*
   2011 U.S. Dist. LEXIS 150998 (S.D.N.Y. 2011) ..................................... 9, 11

*Moquinon, Ltd. v. Gliklad,*
   55 Misc.3d 1212(A) (Sup. Ct. N.Y. Cty. 2017) ...................................... 9, 11

*Rechnitz v. Kutner,*
   2020 U.S. Dist. LEXIS 100092 (E.D.N.Y. 2020) .................................... 9, 11

*Sivault Systems, Inc. v. Wondernet, Ltd.,*
   2005 U.S. Dist. LEXIS 4635 (S.D.N.Y. 2005) ........................................... 11

*Sojitz Corp. v. Prithvi Info. Solutions Ltd.,*
   82 A.D.3d 89 (1st Dep't 2011) .................................................................... 10

*VisionChina Media Inc. v. Shareholder Reps. Svcs.*, LLC,
   109 A.D.3d 49 (1st Dep't 2013) .................................................................... 9

*White Lilly, LLC v. Balestriere PLLC,*
   2022 U.S. Dist. LEXIS 171080 (S.D.N.Y. 2022) ........................................ 8

**Statutes and Court Rules**

CPLR 6211(a) ...................................................................................................... 1

CPLR 6212(a) ................................................................................................... 1, 8

CPLR 7502(c) ............................................................................................. 1, 2, 8, 9

Fed. R. Civ. P. 64 ............................................................................................. 1, 8

i

**Foreign Authorities[1]**

Chitty on Contracts, 35th edn, ................................................................................. 12

*Law Ting Pong Secondary School v Chen Wai Wah*
    [2021] 3 HKLRD 185 ................................................................................. 21

*Makdessi v Cavendish Square Holding BV*
    [2016] AC 1172 ................................................................................. 21

*Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd*
    [2016] AC 742 ................................................................................. 20

*Nazir Ali v Petroleum Company of Trinidad and Tobago*
    [2017] UKPC 2 ................................................................................. 19

*Polyset v Panhandat Ltd* [2002]
    3 HKLRD 319 ................................................................................. 21

*Rainy Sky SA v Kookmin Bank*
    [2011] 1 WLR 2900 ................................................................................. 12

*Union Eagle Ltd v Golden Achievement Ltd*
    [1997] AC 514 ................................................................................. 12

---

[1] Copies of all foreign authorities are appended to the Declaration of Gary Yin, dated November 5, 2024.

Petitioners Blue Axis Global Ltd ("Blue Axis") and Longbyte Inc. ("Longbyte" and together with Blue Axis, "Petitioners"), through their attorneys, Chelney Law Group PLLC, respectfully submit this Memorandum of Law in support of their Petition for an *ex parte* order of attachment in aid of arbitration pursuant to Rule 64 of the Federal Rules of Civil Procedure and CPLR 6211(a), 6212(a), and 7502(c). An attachment of Respondent Alopex Advisors, LLC's ("Respondent" or "Alopex") account at Bank of America, N.A. (#███████9134) up to the amount of the US$4 million Security Deposit advanced by Longbyte under the parties' Letter of Engagement, is required to preserve the efficacy of an arbitral award in Petitioners' favor. This application is supported by a Petition for an Order of Attachment in Aid of Arbitration, dated November 6, 2024, and the Declarations of Stan Chelney, Chen Lei and Gary Yin, and the exhibits attached thereto.

Petitioners also respectfully request that this Court set the undertaking at $25,000, appoint Guaranteed Subpoena Service, Inc., to serve the order of attachment upon Bank of America, and grant Petitioners limited discovery related to the Security Deposit in the event the balance of Alopex's account at Bank of America is less than $4 million.

## PRELIMINARY STATEMENT

Petitioners seek an order attaching a bank account belonging to Respondent Alopex that contains a $4 million "Security Deposit" conveyed to Alopex by Petitioner Longbyte to "secure the Site" for a cryptocurrency mining facility in Iceland. Petitioners are part of an affiliated group of companies in the cryptocurrency industry known as the Bixin Group ("Bixin") that had never previously done business in Iceland, and retained Alopex to help navigate the Icelandic property and energy markets. After Alopex failed to fulfil its obligations under the Letter of Engagement ("LOE") between the parties, Alopex refused demands to return the Deposit. Petitioners

1

commenced an arbitration to recover the Security Deposit in Hong Kong, as provided in the LOE, and seek the attachment to secure the eventual award of the Security Deposit in their favor.

All of the prerequisites for an attachment in aid of arbitration are present.

*First*, absent an attachment, an arbitration award would be rendered "ineffectual" within the meaning of CPLR § 7502(c), the statute governing attachments in aid of arbitration. In the course of the Hong Kong proceedings and further research prompted by disclosures made during those proceedings, Petitioners obtained information indicating that Alopex had dissipated and would further dissipate the Security Deposit, and thus, would not be able to satisfy such an award.

*Second*, Petitioners are likely to prevail on the merits of their claims. It is undisputed that Alopex failed to perform its principal obligation under the LOE, that is, to provide a "definitive written" power purchase agreement between Bixin and an Icelandic electricity provider within 30 days after Bixin, (through Petitioner Longbyte), conveyed the Security Deposit into escrow. The LOE unambiguously states that, in the event Alopex is unable to deliver the required agreement within the timeframe specified, Alopex must return the Security Deposit to Bixin. Alopex's defenses in the arbitration are either contradicted by the express terms of the LOE or barred by governing Hong Kong law.

*Third*, the amount Petitioners demand from the Alopex (i.e., the $4 million Security Deposit) exceeds all counterclaims known to the Petitioners, as Alopex has not asserted any counterclaims in the arbitration.

## FACTUAL BACKGROUND

A cryptocurrency mining project generally entails, among other things, identifying and acquiring a site for the facility, installing computing equipment needed to mine cryptocurrency (the "Miners"), and procuring sufficient electricity to run that equipment at a price that makes mining profitable Declaration of Chen Lei, dated November 1, 2024 ("Lei Decl.") ¶13.

Mining cryptocurrency requires a tremendous amount of energy, so one of the main factors to determine the profitability of a mining project is the cost of electricity. *Id.* at ¶¶12, 14, 19. If electricity cost is too high, it would not make commercial sense to invest in a mining facility as any transaction fees gained from the mining process would be outweighed by the associated operating expenses. *Id.* at ¶14.

In 2021, while exploring a potential investment in the development of a Bitcoin cryptocurrency mining facility in the European Economic Area, Bixin was referred to Alopex. ¶17. Alopex advised that Iceland was the ideal place to host a mining facility because of the relatively low electricity prices, a stable power supply, and Icelandic government support towards cryptocurrency mining. *Id.* at ¶17. Alopex also represented that it could secure two possible sites for the mining facility, and most importantly, would be able to procure electricity at a cost that would make the facility an attractive investment for Bixin. *Id.* at ¶18.

Because the cost of electricity could fluctuate, it was critical to Bixin that Alopex quickly identify and facilitate an arrangement with a power supplier that could offer electricity at a fixed total cost that was attractive to Bixin. *Id.* at ¶20; *see also id.* at ¶21 ("It was made clear to [Alopex] … that timing for execution of the [power purchase agreement] was of critical importance").

Since Bixin had no operations or experience doing business in Iceland, it required assistance navigating the Icelandic property and energy markets, as well as the Icelandic legal and regulatory environment. *Id.* at ¶22. For such assistance, Bixin retained Alopex. *Id.*

Petitioner Blue Axis Global Ltd., entered into a contract, the Letter of Engagement ("LOE"), with Alopex describing the terms under which Alopex would provide services. *Id.* at ¶23, Ex. A. The LOE specified services to be provided by Alopex, including securing the "Physical Premises" for the Bixin's cryptocurrency mining "Facility" in Iceland and arranging for

the provision of electricity to operate the cryptocurrency Miners at a capped price, among other services. *Id.* at ¶24. In exchange, Alopex was to receive US$3 per megawatt hour of electricity Bixin purchased to operate the Miners. *Id.*

Bixin also agreed to deposit US$4 million (the "Security Deposit") into an escrow account to "secure the Site" of the cryptocurrency mining facility, located at Bakkavegur 2, IS-640 Húsavík, Íceland. *Id.* at ¶25, Ex. A §§1.3.3, 2.4, 2.4.1.

The LOE, as amended in Amendment 1, reflected Bixin's priorities, specifically with regard to rapidly identifying and finalizing a Power Purchase Agreement sourcing electricity at a cost that would make the facility an attractive investment for Bixin. *Id.* at ¶¶26-28.

The operative term is contained in Section 2.8, as amended, and requires, among other things, that Alopex provide a "***a definitive written power purchase, power sublease, or similar agreement between Bixin and the power provider of the Facility by or within thirty (30) calendar days of confirmation of full payment of the cash Security Deposit*** (as section 2.4 in original Letter of Engagement) …." *Id.* at ¶¶28-29.

Time was of the essence. In the event Alopex could not satisfy its obligations under Section 2.8, as amended, Alopex was required to return the Security Deposit to Bixin.[2] *Id.* at ¶¶29-30. Amendment 1 provides, in relevant part, that "***In the event that any of the above are not timely satisfied, whether due to the fault of Alopex or an uncured Force Majeure Event …, the Security Deposit shall immediately be returned to Bixin.*** This clause is invalidated if Bixin negotiates with the Power Provider in bad faith, withholds documents, withholds cooperation, unduly delays its or Alopex's performance, and/or fails to provide Alopex with the requisite information or aid necessary to finalize a Power Purchase Agreement between Bixin and the Power Provider." *Id.*

---

[2] Alopex agreed to permit Petitioner Blue Axis to assign the latter's rights in the Letter of Engagement to another Bixin affiliate, Petitioner Longbyte. Lei Decl. ¶¶41-43.

**I.  Petitioner Longbyte Advances US$4 million to "Secure the Site" of the Mining Facility**

Subsequent to the LOE and Amendment 1, Bixin, through Petitioner Longbyte wired or caused to be wired $4 million to the Escrow Agent pursuant to the terms of the Letter of Engagement.  *Id*. at ¶45.  On October 14, 2021, the Escrow Agent confirmed the wires, affirming that "four (4) wires [totaling $4 million] have all cleared and are currently held in the Trust Account pursuant to the Escrow Agreement."  *Id.* at ¶46.

**II.  Alopex Breaches the Letter of Engagement but Refuses to Return the Security Deposit**

The LOE, as amended, obligated Alopex to provide to Longbyte "a definitive written power purchase, power sublease, or similar agreement between Bixin and the power provider of the Facility [a "Power Agreement"] by or within (30) calendar days of confirmation of full payment of the case Security Deposit…"  *Id.* at ¶50.

Thus, the contractual deadline for Alopex to provide the Power Agreement was November 13, 2021.  *Id.* at ¶51.  Alopex failed to meet that deadline and, in fact, never provided a "definitive" written power purchase agreement meeting the agreed upon specifications.  *Id.* at ¶52.

Section 2.8 of the LOE, as amended, further provides that "In the event that any of the above [obligations] are not timely satisfied, whether due to the fault of Alopex or an uncured Force Majeure Event greater than 180 (one hundred eighty) calendar days, ***the Security Deposit shall immediately be returned to Bixin***."  *Id*., Ex. B at §2.8 (emphasis added).

Notwithstanding demands from Bixin to return the Security Deposit advanced to the "secure the Site," Alopex has refused to return the Security Deposit.  *Id* at ¶53.

**III.  After Alopex's Deadline to Secure a "Definitive Written Power Purchase … or Similar Agreement" Expired, the Iceland Project Is Negatively Impacted by Alopex's Failure to Facilitate the Opening of an Icelandic Bank Account for Bixin's Local Affiliate**

After the escrow agent confirmed deposit of the Security Deposit, Alopex introduced Bixin to Advel Attorneys ("Advel"), an Icelandic law firm.  *Id.* at ¶47.  Alopex represented that Advel

5

was one of the leading law firms in Iceland and that it would guide Bixin in setting up the necessary corporate entities and bank accounts in Iceland.  *Id.*

In the weeks that followed, Bixin met with Alopex virtually to determine the best way to proceed, and it was eventually decided with Advel's advice that Bixin would acquire a local Icelandic entity to act as Bixin's local operating subsidiary.  *Id.* at ¶48.  That entity would then open an Icelandic bank account and sign agreements to set up the mining facility.  *Id.*

Advel advised that the KYC process with any Icelandic bank could only commence after Bixin finalized the acquisition of the local subsidiary.  *Id.* at ¶49.  Advel assisted Bixin with this process and it was completed in early December 2021.  *See id.* at ¶¶49-52.

Shortly after the acquisition of Bixin's Icelandic subsidiary was completed, and after Alopex's deadline to provide a power purchase agreement had already expired, Advel introduced Bixin to a corporate consultant at an Icelandic bank.  *Id.* at ¶54.  That consultant assisted Bixin with commencing the KYC process for opening a bank account for Bixin's subsidiary.  *Id.*

Ultimately, however, neither Advel, nor any of the other advisors that Alopex recommended were able to successfully facilitate the opening of a bank account for Bixin's subsidiary in Iceland or, after that failed, Bixin's subsidiaries in Luxembourg or Cyprus.  *Id.* at ¶¶55-64, 74.

## IV.  Alopex Secretly Liquidates the Security Deposit

The LOE, as amended, contemplated that, after Alopex provided a "definitive" power purchase agreement between Bixin and a local power provider, Bixin would enter into an engineering, procurement, and construction contract ("EPC contract") with an Icelandic contractor to construct the Facility.  *Id.* at ¶31.  The EPC contract would include "a well-defined and timely schedule for commencement of construction and/or retrofitting of the Facility."  *Id.*  In the event

that Bixin was unable to finalize the EPC contract in that timeframe, Section 2.7 of the LOE provides that Alopex could take custody of the Security Deposit. *Id.*

The LOE makes clear, however, that Alopex's taking custody of the Security Deposit under Section 2.7, "does not constitute a forfeiture of the Security Deposit." *Id.* at ¶32. To the contrary, in Section 2.9 of the LOE, Alopex, as "Custodian" of the Security Deposit, ""irrevocably and unconditionally guarantees the full amount of the Security Deposit[.]" *Id.*

Because of Alopex and Advel's failure to successfully guide Bixin through the process of opening a bank account for any of its overseas affiliates, Bixin was unable to finalize agreements to construct the mining facility with an Icelandic contractor. *Id.* at ¶65.

In or around February 8, 2022, Alopex liquidated the Security Deposit, purportedly pursuant to Section 2.7 of the LOE. *Id.* at ¶66. In response to Bixin's queries concerning the status of the Security Deposit, Alopex failed to disclose and, in fact, actively concealed that it had liquidated the deposit. *Id.* at ¶71; *id.* at ¶76 ("Alopex deliberately continued to advise Bixin to stay a course that led nowhere, wasting Bixin's time and resources in the process. It was to Alopex's advantage to do so because, had Bixin learned earlier that Alopex could not deliver on its promises earlier, it would have demanded the immediate return of the Security Deposit.").

## V. Petitioner Longbyte Commences an Arbitration in Hong Kong

On April 12, 2023, Longbyte commenced the Arbitration administered by the Hong Kong International Arbitration Centre pursuant to Section 8.6 of the LOE. Declaration of Gary Yin, dated November 5, 2024 ("Yin Decl."), ¶11, Lei Decl., Ex. A, at §8.6. That section provides that, "Any dispute, controversy, or claim arising out of or in connection with this contract, or the breach, termination, or invalidity thereof, shall be finally settled by arbitration administered by the Hong Kong International Arbitration Centre." *Id.*

In accordance with Section 8.5 of the Letter of Engagement, the parties' rights under the LOE are governed by Hong Kong law. Lei. Decl., Ex. A, at §8.5. Accordingly, the arbitrator will apply Hong Kong law to adjudicate the parties' dispute.

## ARGUMENT

Rule 64(b) of the Federal Rules of Civil Procedure specifically applies to Orders of Attachment and incorporates New York law concerning applications for an attachment in aid of arbitration. It provides, in relevant part, that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a); *see also* Fed. R. Civ. P. 64(b) ("The remedies available under this rule include the following… attachment…"

CPLR § 7502(c) provides for prejudgment attachment in aid of arbitration. It states, in relevant part, that a court "may entertain an application for an order of attachment … in connection with an arbitration that is pending or that is to be commenced inside or outside this state… on the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief. The provisions of articles 62 and 63 of this chapter shall apply to the application, including those relating to undertakings, except that the sole ground for the granting of the remedy shall be as stated above."

A request for an Order of Attachment in aid of arbitration requires the petitioner to show that: (i) "the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief[,]" (ii) "it is probable that the plaintiff will succeed on the merits;" of its arbitration claims, and (iii) "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." *See, e.g.,* CPLR 6212(a); CPLR 7502(c); *White Lilly, LLC v. Balestriere PLLC,* 2022 U.S. Dist. LEXIS 171080, at *2 (S.D.N.Y. 2022).

As discussed further below, Bixin's petition for a prejudgment attachment satisfies each of these factors.

## I.  Absent an Attachment, An Arbitration Award Will Be Ineffectual

New York State and federal courts have consistently found that an arbitration award "may be rendered ineffectual" where a petitioner was able to show that, absent the attachment, there was a real possibility that the respondent would not be able to satisfy the award.  *See Rechnitz v. Kutner*, 2020 U.S. Dist. LEXIS 100092, at *41 (E.D.N.Y. 2020) ("generally, it is sufficient that the respondent's assets are dwindling or are being encumbered or moved about, regardless of the respondent's motives"); *Mishcon de Reya New York LLP v. Grail Semiconductor, Inc.*, 2011 U.S. Dist. LEXIS 150998, at *28 (S.D.N.Y. 2011) ("merely 'demonstrating the possibility, if not the likelihood, that absent the attachment being requested, the ultimate arbitration award would be severely compromised' will satisfy the petitioner's burden"); *Moquinon, Ltd. v. Gliklad*, 55 Misc.3d 1212(A) at *6 (Sup. Ct. N.Y. Cty. 2017) ("the party seeking attachment must demonstrate an identifiable risk that the defendant will not be able to satisfy the judgment") quoting *VisionChina Media Inc. v. Shareholder Reps. Svcs.*, LLC, 109 A.D.3d 49, 59 (1st Dep't 2013).

 This standard is satisfied because Alopex's submissions in the Hong Kong Arbitration and publicly available information indicate that Alopex has likely dissipated or will soon dissipate the Security Deposit, and there is reasonable basis to conclude that Alopex has insufficient other assets to satisfy an award.  Accordingly, absent an attachment, an eventual arbitration award in Petitioners' favor would be rendered ineffectual within the meaning of CPLR §7502(c).

In or around the second quarter of 2019, Alopex unsuccessfully sought $3,000,000 in financing for "working capital" at an interest rate of 13%.  Declaration of Stan Chelney, dated November 5, 2024 ("Chelney Decl."), Ex. C [Amended Complaint], at ¶8.  Alopex advanced

$12,500 to a lender, Blue Clover LLC, to cover the cost of the loan's procurement. *Id.*, at ¶¶8-11. In early 2021, after Blue Clover failed to procure the loan, Alopex sued to recover its advance.

Since its failed attempt to procure financing, Alopex had no discernable source of income until it surreptitiously transferred Longbyte's US$4 million Security Deposit from escrow to Alopex's account at Bank of America. Alopex's Statement of Defense, submitted in the Hong Kong Arbitration, states that Alopex "bet the company, timewise and opportunity-wise, on Bixin" confirming that at least until early 2023, when Alopex purported to terminate the LOE, Alopex had no other income producing projects. Yin Decl. Ex. B, at ¶50. And Alopex's website, www.alopexadvisors.com, consists of a single page with Alopex's logo and contact information. Chelney Decl., Ex. A. There is no information about past or current clients or projects through which Alopex generated or would be expected to generate any revenue.

Moreover, a recent search of the New York State Department of State's State Tax Warrant Notice System shows that, as recently as April of this year, Alopex was the subject of outstanding New York State tax warrants for thousands of dollars. Chelney Decl. Ex. B. Thus, there is good reason to believe that Alopex has used the funds advanced by Longbyte to fund its operations and for purposes other than to secure the Site of the Facility.

New York State and federal courts have granted orders of attachment in similar circumstances. *See, e.g., Sojitz Corp. v. Prithvi Info. Solutions Ltd.*, 82 A.D.3d 89, 93-94 (1st Dep't 2011) (upholding attachment "based upon the documentary evidence suggesting that respondent diverted funds from escrow account without an explanation"); *County Natwest Securities Corp. USA v. Jesup, Josephthal & Co.*, 180 A.D.2d 468, 469 (1st Dep't 1992) (reversing denial of attachment where "there is some indication that it has engaged in liquidating and transferring assets"); *Habitations Ltd. v. BKL Realty Sales Corp.*, 160 A.D.2d 423, 424 (1st Dep't

1990) (reversing order denying attachment where corporate respondent was "merely a shell with no appreciable liquid assets," was "stripped" by its principal, and where corporate principal "historically failed to pay his creditors,"); *Rechnitz*, 2020 U.S. Dist. LEXIS 100092, at *40-41 (awarding attachment where evidence showed that respondent "did not have the money to pay [petitioner]"); *Moquinon*, 55 Misc.3d 1212(A) at *6 (awarding attachment where evidence showed that respondent's New York assets were the "sole source for satisfaction" and respondent "intends to dissipate" the assets); *Mishcon*, 2011 U.S. Dist. LEXIS 150998, at *35 (granting order of attachment where petitioner made "sufficient showing of [respondent's] insolvency"); *Sivault Systems, Inc. v. Wondernet, Ltd.*, 2005 U.S. Dist. LEXIS 4635, at *13 (S.D.N.Y. 2005) (attachment proper where the record "suggests [respondent's] potential insolvency").

## II. Petitioners are Likely to Succeed on the Merits of their Claims in the Hong Kong Arbitration

To demonstrate likelihood of success on the merits in the arbitration, a petitioner "must demonstrate by affidavit that it is more likely than not that it will succeed on its claims." *Mishcon*, 2011 U.S. Dist. LEXIS 150998, at *14. "[A]ll legitimate inferences" as to the likelihood determination "should be drawn in favor of the party seeking attachment." *Id.* at *14-15 quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 306 F.Supp.2d 482, 485 (S.D.N.Y. 2004).

Here, Petitioners are likely to prevail on their claims in the Hong Kong arbitration and recover the Security Deposit from Alopex because:

A. the express terms of the parties' agreement require Alopex to return the Security Deposit because Alopex failed to perform its obligation to deliver a "definitive" power purchase agreement between Bixin and an Icelandic power provider;

11

B. the terms of the LOE undermine Alopex's defenses that Alopex "earned" the Security Deposit and Bixin forfeited the Security Deposit by failing to perform its own obligations;

C. Alopex's position that the LOE contains an implied term requiring Bixin to complete the KYC process and open a bank account as a prerequisite to Alopex's own performance is inconsistent with governing Hong Kong law;

D. even if the LOE"s terms required forfeiture of the Security Deposit (they do not), those provisions are an unenforceable penalty under Hong Kong law (rather than a "true deposit" subject to forfeiture); and

E. Bixin can also recover the Security Deposit on equitable theories recognized under applicable Hong Kong law.

**A.  Petitioners are Likely to Prevail in the Hong Kong Arbitration Because the Express Terms of the LOE Require Alopex to Return the Security Deposit**

Under applicable Hong Kong law, unambiguous contract terms must be enforced according to their terms.  Yin Decl. ¶33 ("[W]here the parties have used unambiguous language, the court must apply it") quoting *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900 at §23.  Hong Kong also takes a "strict view on provisions relating to time stipulations,"  Yin Decl. ¶36 citing Chitty on Contracts, 35th edn, §28-027, with "even a slight delay … seen as a repudiatory breach," Yin Decl. ¶36 citing *Union Eagle Ltd v Golden Achievement Ltd* [1997] AC 514.

Here, the plain and unambiguous terms of the LOE, specifically Section 2.8, as amended, require that Alopex provide, among other things, a "definitive" agreement between Bixin and a power provider satisfying Bixin's requirements.  In the event Alopex was unable to deliver such an agreement, within the 30-day time frame specified in the LOE, Alopex was required to return the Security Deposit to Bixin.  Section 2.8 states, in relevant part, that:

> "***Alopex represents that it shall provide*** for the following: (i) the services set forth in § 1.3 hereto; (ii) ***a definitive written power***

12

> ***purchase, power sublease, or similar agreement between Bixin
> and the power provider of the Facility by or within thirty (30)
> calendar days of confirmation of full payment of the cash Security
> Deposit*** (as section 2.4 in original Letter of Engagement) as wired
> to the escrow account or Alopex; … **In the event that any of the
> above are not timely satisfied,** whether due to the fault of Alopex
> or an uncured Force Majeure Event greater than 180 (one hundred
> eighty) calendar days, ***the Security Deposit shall immediately be
> returned to Bixin.*** …"  (Emphasis added).

To date, Alopex has failed to produce any evidence that it provided "a definitive written
power purchase, power sublease, or similar agreement between Bixin and the power provider of
the Facility" within the time period specified in the LOE.  Yin Decl. ¶30.  It has not produced a
copy of such an agreement, nor have either of Alopex's witnesses claimed that such an agreement
existed and was provided to Bixin within the timeframe specified in the LOE.  *Id.* at ¶31.  Mr.
Czinger, Alopex's principal, claims that he "identified" and "opportunity" to acquire rights to an
existing power purchase agreement from another entity, PCC BakkiSilicon, but presents no
documentation showing that PCC BakkiSilicon's power purchase agreement conformed to the
specifications in the LOE, or that Alopex made any effort to conclude the acquisition, much less
that Alopex provided the requisite agreement to Bixin within the timeframe specified in the LOE.
*Id.*  Mr. Margeirsson, a consultant that worked with Mr. Czinger and also submitted a witness
statement, expresses only a "belief that it would have been possible for [Bixin] to enter into a PPA
in Iceland by November 2021" without actually identifying a "definitive" agreement "between
Bixin and the power provider."  *Id.* Ex. D, at ¶8.

Accordingly, under the express terms of the LOE, the Hong Kong arbitral tribunal will
order Alopex to return the Security Deposit to Bixin.

**B.  Alopex's Contractual Defenses are Meritless**

Alopex asserts a variety of contractual defenses based on other provisions of the LOE and other clauses in Section 2.8.  Alopex claims that it is not required to return the Security Deposit to Petitioners because

      (i)     under Section 2.4.1 of the LOE, the deposit was "deemed earned" by Alopex when it was escrowed;

      (ii)    Alopex's obligation under Section 2.8 to return the Security Deposit should be "invalidated" because Bixin prevented Alopex from performing; and

      (iii)   Bixin forfeited its rights to the Security Deposit under Sections 2.4.6 and 2.10 of the LOE.

As discussed in greater detail below, each of these defenses are meritless.

*i)  Alopex did not "earn" the Security Deposit.*

In the arbitration, Alopex claims that it is not required to return the Security Deposit to Petitioners because, under Section 2.4.1 of the LOE, the deposit was "deemed earned" by Alopex when it was escrowed.  Yin Decl. ¶38.

This argument is contradicted by the express terms of the LOE.  Section 2.4.1 of the provides, in relevant part, that "where Alopex has not performed under §2.8 … the deposit shall not be deemed as earned by Alopex."  *Id.* at ¶39.  Thus, because Alopex did not perform its obligations under §2.8, it did not "earn" the Security Deposit.

*ii)  Alopex's claim that Bixin prevented Alopex from performing is without merit.*

Alopex takes the position that the requirement to return the Security Deposit in Section 2.8 of the LOE is "invalidated" "if Bixin negotiates with the Power Provider in bad faith, withholds documents, withholds cooperation, unduly delays its or Alopex's performance, and/or fails to provide Alopex with the requisite information or aid necessary to finalize a Power Purchase Agreement between Bixin and the Power Provider."  Yin Decl. ¶41, Ex. B, at ¶65(c).  According

to Alopex, Bixin's "lack of cooperation was a constant roadblock to Alopex's performance under the LOE," that Petitioners, "failed to pass KYC," and "failed to perform their explicit obligations" under the LOE.  *Id.*

This argument is premised upon allegations that Bixin was not "forthcoming with information and documentation required to pass KYC."  *Id.*, Ex. B, at ¶¶34-35.  This is not consistent with the evidence presented in the arbitration, which shows that Bixin provided all of the documentation requested by Alopex and Alopex's chosen advisors.  Yin Decl. ¶69.

In any event, passing KYC and opening a bank account in Iceland, could not have been a contractual prerequisite to the performance of Alopex's obligations under Section 2.8, and any delay in passing KYC should not have impacted Alopex's own performance.  The evidence disclosed in the Hong Kong arbitration demonstrates that the parties did not begin the KYC process with any banks until December of 2021, *after* Alopex's deadline had already expired.  Yin Decl. ¶44, Ex. 6, at ¶¶64-68.  If successful completion of the KYC process was actually necessary for Alopex's performance of its obligations by the deadline set in Section 2.8, then Alopex would have begun that process well before the deadline, rather than after it.

In his most recent witness statement, Mr. Czinger also suggests that Bixin failed to act promptly on an "opportunity" Alopex "identified" to purchase an existing power purchase agreement from PCC BakkiSilicon.  Yin Decl. ¶31, Ex. 7, at ¶¶17-19.  However, Mr. Czinger provides no evidence that PCC BakkiSilicon's agreement conformed to the specifications in the LOE or that Alopex made any effort to move forward with the alleged purchase within the LOE's 30-day timeframe.  Yin Decl. ¶31; Lei Decl. ¶¶54-56.

*iii) Alopex's claim that Petitioners forfeited the Security Deposit is meritless.*

Alopex also claims that Petitioners forfeited the Security Deposit under Sections 2.4.6 and 2.10 of the LOE.  Yin Decl. ¶45, Ex. B, at ¶¶67-68.  These claims are also incorrect.

Section 2.4.6, as amended, provides that *if Bixin "elects in writing"* to follow the "schedule" for the return of the Security Deposit specified in Section 2.4.5, it had to satisfy certain conditions. Yin Decl. ¶47 (emphasis added). This provision does not support forfeiture of the Security Deposit because Bixin never elected, in writing to Alopex, that the return of the Security Deposit should follow the schedule in Section 2.4.5.[3] Yin Decl. ¶48.

Section 2.10 of the LOE specified the conditions under which Bixin would "forfeit" the Security Deposit:

> Forfeiture of Deposit. If Bixin fails to adequately meet the stated delivery deadlines, fails in its contractual duties for installation, materially breaches this Agreement … terminates this Agreement, and/or causes Alopex to terminate this contract for non-performance or Bixin's default—notwithstanding the provisions under §2.4.6—Bixin will forfeit all rights and claims to the Security Deposit to Alopex. If such delay in performance lasts more than ten (10) business days, Alopex reserves the right to terminate this Agreement immediately by written notice.

Alopex claims that Bixin forfeited the Security Deposit under this provision because it (1) "failed to meet stated delivery deadlines," by not transferring the Security Deposit into escrow immediately upon executing the LOE, and failing to finalize initial agreements for construction of the facility within the 60-time frame in the LOE; (2) failed to meet its "contractual duties for installation," by not securing the "site" (or allowing Alopex to secure the site) for the Facility, and not installing the Miners and related equipment; and (3) materially breached the Letter of Engagement by failing to pass Know Your Customer ("KYC") process required to open an account at an Icelandic bank despite representing that it was able "to effectuate the Transaction." None of these claims have merit.

---

[3] Section 2.4.6, as amended, also expressly provides that "in the event of Alopex's breach of §2.8 of this Engagement [requiring Alopex to provide a definitive power purchase agreement within 30 days] . . ., Alopex shall have no claim or right to the Security Deposit and the Security Deposit shall be immediately returned to Bixin." Yin Decl. ¶¶47, 49.

*First*, LOE §2.4.1, which states that "Immediately upon execution of this Agreement and a separate Escrow Agreement, Bixin will deposit $4,000,000 … with a US-based, third-party escrow agent," is not the type of construction-related "delivery deadline" contemplated by the parties in the LOE.  Yin Decl. ¶52.  There are no "stated delivery deadlines" in the LOE because the parties contemplating setting such deadlines later.  *Id.*[4]

In any event, Bixin could not "immediately" deliver the Security Deposit upon signing the LOE because the Escrow Agreement appointing a "US-based, third-party escrow agent" designated to receive the deposit was not fully executed until over a month after the original LOE, and almost a week after Amendment 1.  Yin Decl. ¶53.  Thus, any purported delay in payment of the Security Deposit, which Alopex never objected to until Bixin commenced the arbitration, *id.* at ¶54, is immaterial, and sufficiently "immediate" to satisfy this LOE §2.4.1.  *See id.*

*Second*, Bixin did not breach and could not have breached its "installation" obligations by not securing the "site" (or allowing Alopex to secure the site) for the Facility, and not installing the Miners and related equipment.  Securing the "Site" of the Facility was Alopex's responsibility, not Bixin's.  Yin Decl. ¶55; Lei Decl. ¶25, Ex. A, at §§2.4, 2.4.1.  In fact, Bixin provided Alopex the US$4 million Security Deposit for that express purpose pursuant to Section 2.4 of the LOE, and there is no evidence that Bixin impeded Alopex from doing so.  Yin Decl. ¶55.  Moreover, there was no deadline for Bixin's obligation to deliver and install Miners on the Site because the prerequisites for such delivery never occurred.  *Id.* at ¶56.  Indeed, Bixin's obligations to deliver and install the Miners was never triggered because Alopex failed to "secure the Site" and Bixin did not finalize agreements with an Icelandic contractor to construct or retrofit the Facility.  *Id.*

---

[4] The parties contemplated that such deadlines would be set when Bixin "finalized initial agreements" with an Icelandic contractor, "including a well-defined and timely schedule for commencement of construction and/or retrofitting of the Facility."  *Id.*, Ex. B, at §2.7.

*Third*, contrary to Alopex's argument in the Hong Kong arbitration, there is no section of the LOE that requires Bixin to pass KYC requirements or to open an Icelandic bank account. Section 1.4 of the Letter Agreement which states that "Bixin has indicated to Alopex that Bixin (or any of its Affiliates) has an interest in and ability to effectuate the Transaction" does not require that Bixin do so. The "Transaction" referenced in this provision is defined in Section 1.2 as "Bixin, potentially in syndication with another investor, investors, and/or partners, ***will provide a minimum amount of mining units (the Miners) in order to utilize 85% of the available power provided under this Agreement and will deliver them to the Facility*** (§1.3.1), Alopex, or an Affiliate (§5.2) of Alopex, will provide the requisite Services (§1.3) for the operation of the Miners." Yin Decl. ¶57. Thus, in section 1.4 Bixin merely "indicated" its "interest in and ability" to deliver miners to the facility. *Id.* Neither Section 1.4 nor the "Transaction" it references concern completion of the KYC process. *Id.*

## C. There Is No Basis to Imply a Term Requiring Bixin to Complete the KYC Process and Open an Icelandic Bank Account as a Prerequisite to Alopex's Performance

Because Alopex cannot demonstrate that it is entitled to retain the Security Deposit based on the express terms of the LOE, it has petitioned the arbitral tribunal rewrite the LOE to insert a term requiring "Longbyte, or a company operating on its behalf in the Bixin Group," to "pass all necessary KYC and AML requirements." Yin Decl. ¶58, Ex. B, at ¶75(b). Alopex essentially argues that Petitioners breached this non-existent obligation, and that such breach results in the forfeiture of the Security Deposit. *Id.*

Under Hong Kong law, a court will only imply a term if it is (i) reasonable and equitable, (ii) necessary to give business efficacy to the contract or is so obvious it "goes with saying," (iii) capable of clear expression, and (iv) does not contradict any express terms of the contract. Yin

Decl. ¶59.  The "default position" however, is that "nothing is to be implied" and that the "parties intended what was written in the contract and nothing more."  Yin Decl. ¶¶67-68.

Here, the term proposed by Alopex is neither "reasonable and equitable," nor "necessary to give business efficacy to the contract," but rather, contradicts express terms of the contract.

*First*, rewriting the parties' agreement to essentially create a new basis for forfeiture of the Security Deposit is neither reasonable nor equitable because it would fundamentally alter the distribution of risks reflected in the LOE to favor Alopex, the party with superior knowledge, and include a term that Bixin would never have agreed to in negotiations.  Yin Decl. ¶60.  Unlike Bixin, Alopex had extensive experience operating in Iceland, "with close connections with the Icelandic government and other useful contacts in the engineering, legal, accounting and data hosting industries."  *Id.* at ¶61, Ex. 4, at ¶26(C).  Thus, Bixin "expected Alopex to advise [it] properly of the possible roadblocks that Bixin Mining would encounter in establishing a presence in Iceland."  *Id.* at ¶62, Ex. 6, at ¶58.  Although Bixin relied upon Alopex in this regard, Alopex never disclosed the KYC process as a potential risk to Bixin's investment in Iceland, nor did Alopex suggest that Bixin would forfeit the Security Deposit if it was unable to pass KYC.  *Id.* at ¶¶63-64.  Bixin, the party with little expertise in Iceland, would never have agreed to assume the risk that it would forfeit the Security Deposit if its affiliate could not pass the KYC process and open an Icelandic bank account.  *Id.* at ¶65, Ex. 6., at ¶57.  This is because Bixin had no control over whether it could pass the KYC and no way to mitigate that risk.  *Id.*  Indeed, Bixin relied on Alopex (and Alopex's chosen advisors) to "guide Bixin [] through the KYC processes."  *Id.*, Ex. 6, at ¶87; *see also id.*, at ¶60.

*Second*, implying a term requiring forfeiture of the Security Deposit if Bixin could not successfully complete the KYC process is also not necessary to give efficacy to the parties'

agreement.  Under Hong Kong law, the "[t]he concept of necessity must not be watered down.  Necessity is not established by showing that the contract would be improved by the addition.  The fairness or equity of a suggested implied term is an essential but not a sufficient pre-condition for inclusion."  Yin Decl. ¶68 quoting *Nazir Ali v Petroleum Company of Trinidad and Tobago* [2017] UKPC 2.  Indeed, "a term can only be implied if, without the term, the contract would lack commercial or practical coherence".  Yin Decl. ¶68 quoting *Marks & Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd* [2016] AC 742.

Here, the Amended LOE is commercially and practically coherent.  The parties expressly provided for forfeiture ***only*** in specific circumstances, by implication excluding other circumstances, and there is no basis in Hong Kong law to rewrite their agreement to impose an additional basis for forfeiture not contemplated by the parties at the time they entered into their agreement.  Yin Decl. ¶69.

*Third*, implying Alopex's proposed term would contradict an express term in the LOE.  Specifically, under Section 2.8, Alopex is required to provide a "definitive" power purchase or similar agreement "within thirty (30) calendar days of confirmation of full payment of the cash Security Deposit."  There are no conditions placed upon this obligation and the evidence adduced during the arbitration shows the parties did not even begin the KYC process with any Icelandic bank until after Alopex's deadline to provide a "definitive" power purchase agreement had already expired.  Yin Decl. ¶71.  Imposing a condition on Alopex's performance would therefore effectively excuse Alopex from performing within the time period expressly stated in the LOE.  *Id.*  Hong Kong law does not permit the tribunal to imply a term in these circumstances.  *Id.* at ¶72.

**D.  Even Assuming the Contractual Conditions for Forfeiture of the Security Deposit Were Met, Those Provisions Would Not Be Enforceable Under Hong Kong Law**

Under applicable Hong Kong law, Section 2.10, the provision of the LOE concerning forfeiture of the Security Deposit is an unenforceable penalty, rather than a "true deposit" that can be forfeited.  For a deposit to be treated as a "true deposit" and therefore subject to forfeiture in the event of a parties' failure to perform, it must be reasonable when compared with "the customary or conventional level of deposits generally taken as an earnest of performance."  Yin Decl. ¶74 quoting *Polyset v Panhandat Ltd* [2002] 3 HKLRD 319, §89.  Failing that, there must be special circumstances that justify the forfeiture of the larger or more extravagant sum.  *Id.*

Alopex has not presented any evidence establishing "the customary or conventional level of deposits" for a contract such as the LOE.  *Id.* at ¶75.  Here, whether the Security Deposit was reasonable can only be assessed by reference to its purpose, specifically, to "secure the Site" of the facility.  *Id.* at ¶76.  Alopex alleges that a payment of between US$500,000 and US$2 million was required to secure the real estate for the mining facility.  *Id.*  The sum of US$4 million, which is between 100% and 800% of such a payment, cannot be reasonable as an earnest of performance. *Id.*

Because the Security Deposit is not a "true deposit," Section 2.10 is unenforceable as a penalty clause.  In considering whether a provision would be construed as a penalty clause, the test is "whether the impugned provision is a secondary obligation which imposes a detriment on a contract-breaker out of all proportion to any legitimate interest of the innocent party in the enforcement of the primary obligation."  Yin Decl. ¶77 quoting *Makdessi v Cavendish Square Holding BV* [2016] AC 1172, as approved in *Law Ting Pong Secondary School v Chen Wai Wah* [2021] 3 HKLRD 185).  Section 2.10 has all the hallmarks of a penalty clause.  First, it gives rise to a secondary obligation as the right to forfeiture is triggered upon the occurrence of any of five

events, all of which involve a breach of contract by Bixin.  Second, the parties expressly agreed that the purpose of the Security Deposit was to "secure the Site" (of the mining facility).  It follows that the legitimate interest to be protected by Section 2.10 is to ensure that Bixin deposits sufficient money in escrow to reimburse Alopex for the payment made to secure the site.  As explained above, the Deposit in the sum of US$4 million significantly exceeds the payment needed to secure the real estate of the mining facility and is out of all proportion to the legitimate interest sought to be protected by Section 2.10.

### E.  Petitioners Are Entitled to Recover the Security Deposit Under the Equitable Doctrines of *Quistclose* Trust and Unjust Enrichment

Bixin should also recover the Security Deposit because a *Quistclose* trust was created over the funds.  Yin Decl. ¶80.  A *Quistclose* trust is a legal arrangement under Hong Kong law where a person or entity is given money or property with the expectation that it will be used for a specific purpose.  *See id.* at ¶¶80-81.  If the money is not used for that purpose, a court treats the recipient as holding the money in trust for the payor and the payor may recover the funds.  *Id.*

Here, Section 2.4 of the LOE expressly states that Bixin advanced the Security Deposit to Alopex to "secure the Site" of the mining facility, *id.* at ¶82, and the circumstances indicate that the parties intended that the funds be held in trust for that purpose.  *Id.* at ¶84, (a)-(d).  Because that purpose can no longer be satisfied, the money must be returned to Bixin.  *Id.* at ¶85.

Petitioners may also recover the Security Deposit on an unjust enrichment theory.  Under Hong Kong law, the elements of a claim for unjust enrichment are (i) a benefit obtained by the defendant, (ii) at the plaintiff's expense, (iii) with the resulting enrichment being unjust, and (iv) the defendant cannot prove any applicable defense.  Yin Decl. ¶86.  The first three elements are met because Alopex did not use the $4 million Security Deposit for its intended purpose, i.e., to "secure the Site" of the mining facility, but purported to keep the benefit for itself.  *Id.* at ¶87.

22

Alopex's sole defense is that the terms of the LOE bar recovery on an unjust enrichment theory. *Id.* at ¶88. But, this defense is inconsistent with Hong Kong law, which allows for restitution for unjust enrichment notwithstanding the existence of a contract where, as is the case here, recovery on an unjust enrichment theory does not "subvert the contractual allocation of risk." Yin Decl. ¶¶89-90.

Alopex has claimed that Bixin's inability to successfully complete the KYC process impeded the performance of Alopex's own obligations. *Id.* at ¶91. Even if that were true (it is not because, as stated above, the KYC process did not even begin until well after Alopex's performance was due), Bixin may recover the Security Deposit on an unjust enrichment theory because neither Section 2.8, which states Alopex's obligation to provide a power purchase agreement, nor Section 2.10, concerning the forfeiture of the Security Deposit, allocate the risk of an unsuccessful KYC process to Bixin. *Id.* at ¶92. Thus, the parties "contractual allocation of risk" is undisturbed by recovery of the Security Deposit on an unjust enrichment theory. *Id.*

## III. The Amount Demanded in Arbitration Exceeds All Counterclaims

The third element of the attachment standard, that "the amount demanded from the [Alopex] exceeds all counterclaims known to the [Longbyte]" is also satisfied. Alopex has not asserted any counterclaims in the Hong Kong arbitration. Yin Decl. ¶15.

## **CONCLUSION**

For all of the foregoing reasons, Petitioners respectfully requests that this Court enter an order of attachment in aid of arbitration securing the $4 million Security Deposit in Respondent's account at Bank of America pending the outcome of the Hong Kong arbitration.

Dated:  New York, New York
         November 6, 2025

Respectfully submitted,

By:  */s/Stan Chelney*

Stan Chelney
Philipp Smaylovsky

CHELNEY LAW GROUP PLLC
28 Liberty Street, 6th Floor
New York, NY 10005
(212) 653-0024

*Attorneys for Petitioners*
*Blue Axis Global Ltd and Longbyte Inc.*