UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BLUE AXIS GLOBAL LTD & LONGBYTE INC., <br><br> Petitioners, <br><br> v. <br><br> ALOPEX ADVISORS, LLC, <br><br> Respondent. | 24-mc-508 (RA) |

**DECLARATION OF MATTHEW CZINGER IN SUPPORT OF OPPOSITION TO MOTION TO CONFIRM TEMPORARY ORDER OF ATTACHMENT**

I, Matthew Czinger, declare:

1. I am currently the CEO and founder of Alopex, based in New York City, New York. In this declaration, which I am submitting in support of Alopex's motion, I set out relevant facts about (i) my personal background, (ii) my company's business relationship with the Bixin Group, and (iii) Alopex Advisors, LLC's ability to fully satisfy any award that might be rendered against it in the pending arbitration between Alopex and the Petitioners in Hong Kong.

### I. Personal Background

2. I hold a Bachelor of Science Degree in Mathematics and a Bachelor of Arts Degree in Music from Stanford University.

1

3. Prior to founding Alopex, I worked as an associate in Citibank's internal Mergers & Acquisitions group, targeting international banks for acquisition. Following that position, I was a junior partner at Greenwich Energy Group, LLP. At Greenwich, I led the quant, structuring, and analytics team, which involved international large scale project transactions. I was also involved in renewable energy projects within the United States, Europe, and India.

4. In 2011, I founded Alopex, which is a business focused on the buy and sell side of financial advisory services for large-scale, sustainable energy and infrastructure projects. Through my involvement with Alopex, I have been engaged on, and deployed my experience and expertise in, projects located in the Arctic, Scandinavia, and the Central European regions.

5. In terms of dollar volumes for the projects that I have been involved in or provided consultation to, said projects would sometimes exceed tens, if not hundreds, of millions of US dollars. Presently, I continue to work on energy projects, which are predominantly located in Iceland.

6. I have worked on both buy-side and sell-side of energy and energy infrastructure projects in Iceland. Alopex has sourced energy for energy intensive users—including the cryptocurrency industry going back to 2018. Alopex has consulted for private equity firms in Europe looking to acquire major energy assets and/or companies in Iceland. I personally have close connections with many members of the energy, banking, and political sectors within the country.

## II. Business Relationship with the Bixin Group

7. In July of 2021, I was introduced to Mr. Frank Yang, who was working for the Bixin Group at the time. When we spoke, at times with his full team including Mr. Charles Chen and Bixin counsel in China, he expressed interest in pursuing an investment for Bixin in Iceland and told me he was Bixin's Iceland Project Manager. He explained that Mr. Wu Gang, the owner of the

Bixin Group, was looking to find opportunities for an energy source to support its crypto mining activities and was prepared to use a BVI incorporated entity to pursue a project in Iceland.

8. I have expertise finding energy sources and establishing frameworks to exploit those sources in Iceland and Greenland since about 2011, which I explained to Mr. Yang and to his colleagues, including Mr. Charles Chen. I also had contacts at the major energy companies in Iceland, as well as at the relevant municipalities, and had a local law firm to be able to get the project off the ground. Mr. Yang made Bixin sound like a sophisticated contracting partner with foreign investment capabilities, so even prior to officially engaging with Bixin, I began reaching out to these contacts to assess whether they would be interested in becoming involved with the Project. It was only later that I found out Bixin's ultimate beneficial owner, Mr. Gang, could not justify where his money came from, and was unable to provide any proof of "clean" revenue or proof of ownership of the miners and/ or assets of Bixin; this information was necessary for any major bank to open a bank account and accept an influx of money in the amount Bixin proposed.

9. I have since learned, from the evidence presented in the parties' arbitration, that Bixin had shuttered its mining operations in 2019 and only had a pair of BVI shell companies with no assets. That is contrary to what I was told before entering into the LOE, which was that Bixin had over 300MW currently operating and that they were a listed company.

10. When I was negotiating the LOE, I explained that a Security Deposit would be required to secure Alopex against the failure of the Project. Alopex required this as it was becoming an exclusive advisor and consultant to Bixin for a period of five years, and I was risking my reputation and loss of a major economic opportunity on which Alopex could capitalize with contacts I had built up over 10 years with a client I had recently met.

11. In text exchanges between Ms. Teresa Chiao (who was acting as intermediatory between the parties), Mr. Yang, Ms. Li and myself, it was made clear that the deposit was a "concept of a security deposit" and if Bixin did not follow through with its investment in the Project then it would be forfeited.

12. I spent a great deal of my own time, monetary resources, and social and political capital working to advise the Bixin Group through the process of entering into a power purchase agreement in Iceland. All that effort was ultimately for naught, as the Bixin Group has a track record of failing to provide forthcoming and complete information—initially to my company, later to relevant authorities in Iceland and Luxembourg and to their own attorneys, Advel.

13. In September 2021, I traveled to Iceland to connect Bixin with possible partners for an eventual power purchase and infrastructure agreement. In particular, my company had identified numerous opportunities, including with PCC BakkiSilicon to take over its existing power purchase agreement with Landsvirkjun. Alopex identified this opportunity in late 2020 and met with a representative of PCC BakkiSilicon in September 2021 to discuss the potential deal. On 5 October 2021, I communicated to Mr. Yang and Mr. Chen that this opportunity would be particularly beneficial given that Bixin would be able to acquire the land, as investigated and confirmed by their Icelandic counsel, as well as the energy and facility in one transaction. During this period, I worked with PCC BakkiSilicon's board director to assist Bixin with commencing PCC BakkiSilicon's KYC processes.

14. Alopex also identified multiple avenues for Bixin to enter into new power purchase agreements with Landsvirkjun, one of the major energy suppliers in Iceland, which supplies 75% of Iceland's energy, which the parties understood would be a longer process than taking over BakkiSilicon's existing PPA.

4

15. I introduced the Bixin Group and the project to influential Icelandic political and commercial figures (including the mayors of two towns that were potential project sites, Husavik and Hafnarfjordur, the HS Orka team (the third largest electricity producer in Iceland), a board member of PCC BakkiSilicon (whose existing power purchase agreement ("PPA") Bixin evaluated acquiring), and the Icelandic Minister of Energy.

16. I introduced Bixin to local Icelandic legal counsel (a well-known local law firm called Advel that had extensive experience working with both foreign and local crypto mining companies operating in Iceland) to advise Blue Axis on Icelandic legal issues, including Anti Money Laundering ("AML"), Know Your Customer ("KYC") and tax requirements and processes. I afterwards learned that Bixin was prepared to use personal emails and mislead Arion Banki and Íslandsbanki that they were not a crypto-related company

17. I connected Bixin with preeminent banks in Iceland, Arion Banki and Íslandsbanki.

18. I also introduced Bixin to Mr. Ásgeir Margeirsson, former CEO of HS Orka, who has extensive experience in the Icelandic energy industry. Mr. Margeirsson worked with Alopex and Bixin to advise on the Project and assisted with setting up meetings with various stakeholders in the Icelandic energy industry, including with members of HS Orka, Landsvirkjun, Orkuveita Reykjavíkur, as well as smaller energy providers and relevant political and regulatory figures.

19. I met with representatives from Borealis Data Center, a well-established company that operates multiple sustainable data centers in Iceland, to discuss hosting options for the Miners and took a representative from Bixin to visit one of their data centers.

20. As well as this, I took Mr. Yang on a site visit to the atNorth data center, Mjölnir, near Keflavík and took a photo during this visit. This site was particularly relevant because it was of a similar size to the project they wished to construct.



Arbitration exhibit [G/29].

21.    All told, and even before the Bixin Group had transferred the full security deposit to the escrow agent pursuant to the terms of the LOE, I proceeded in good faith and:

    a. liased with Advel to incorporate an Icelandic company for Longbyte's operations in Iceland;

    b. liased with counsel in Luxembourg to register a new holding company and negotiate real estate and energy contracts for Longbyte for tax optimization purposes and because it was necessary to have an EU company in Bixin's ownership structure;

    c. researched appropriate locations for facilities to house Longbyte's team of miners on the premises;

6

  d. met with Ístak and Verkís; companies specializing in architecture, building, drawing, and permitting commercial buildings in Iceland;

  e. set up calls between Longbyte and Alopex's corporate finance advisors;

  f. walked Longbyte's corporate finance team through Value added Tax / Bitcoin requirements and structuring,

  g. set up a data room and uploaded different building schematics for the purposes of project due diligence;

  h. arranged invitations to Iceland, through counsel, for visa travel;

  i. hired an electrician and engineering advisor; and

  j. traveled to Iceland every four to six weeks, for extensive periods each visit, to work on many of the various tasks described above during a difficult travel time due to COVID restrictions.

22. All of that work was wasted, because Bixin had ongoing issues with standard AML and KYC requirements, due in part to Bixin's provision of false and/or misleading information in connection with those queries, its inability to provide sufficient information regarding the ultimate beneficial owner of Bixin (Mr. Wu Gang), and its inability to show source of funds.

23. As a result of these failures, the opportunities I lined up for Bixin simply passed by. For example, I arranged a meeting with Landsvirkjun on January 28, 2022. However, the day before the meeting was due to take place, Advel strongly advised against Bixin attending the meeting due to its continued failure of KYC checks and the high likelihood that it would immediately fail Landsvirkjun's KYC checks, thereby jeopardizing any future potential relationship. Despite this, I still met with the CEO of Landsvirkjun and introduced Bixin as a prospective entity. Also in January 2022, the opportunity with PCC BakkiSilicon looked like it

would not be available for much longer, so I arranged for Bixin to carry out a site visit to the Substation. However, Bixin was unable to progress this deal as it was unable to incorporate an entity within Iceland capable of holding a bank account so could not enter into any commercial relationship with PCC BakkiSilicon.

24. It should be noted that Icelandic energy companies will rely on banks, such as Arion Banki, to conduct due diligence on potential PPA partners. Given the large dollar-volumes associated with major energy purchases, the financial stability and health of an energy off-taker is vital to the operation of a power producer. Energy, if not sold, cannot be stored or easily sent elsewhere. Therefore, any failure to accept or pay for energy would amount to a total loss for the energy producer. Similarly, as power producers and energy companies are formal entities, they would not engage in, or incur the cost for, a speculative power purchase agreement with an unformed, unfunded, and unstructured counterparty.

25. By February 2022, I was now aware that Bixin: (i) did not have an Icelandic entity capable of holding a bank account; (ii) was unable to incorporate a Luxembourg entity; (iii) was causing issues with Advel's own internal KYC; (iv) was failing international KYC/ AML requirements for its companies and its ultimate beneficial owner; and (v) was advised by Advel that it was highly unlikely any energy company would be willing to negotiate a PPA.

26. Once it became apparent that the project underlying the LOE could not advance due to Bixin's repeated failures to pass AML and KYC processes in Iceland or Luxembourg, I requested that the Escrow Agent liquidate the Security Deposit in February 2022, consistent with Alopex's rights under §2.7 of the LOE.

27. Still, Bixin continued to attempt to pass KYC and AML checks, which it continued to fail. Any advice given by Alopex, its own counsel, or its independent advisors went unheeded

regarding the proffering of relevant business records, relevant financial statements, relevant business ownership, payroll records, clear sources of funds, etc.

28.    To be clear, Bixin never claimed that Alopex had breached the LOE until it commenced this arbitration.

29.    In an email to Mr. Chen on June 28, 2022 I reiterated my commitment to pursuing the new project with Mr. Chen's companies and stated that a new agreement would have to be reached. In this email I also outlined my serious concerns regarding Bixin's risk of triggering a European wide anti-money laundering investigation due to its continued KYC failures:

> --------- 转发的邮件 ---------
> 发件人：**Matthew B. Czinger** <mczinger@alopexadvisors.com>
> 日期：2022 年 6 月 28 日 周二 07:43
> 主题：Charles' companies in lieu of Bixin
> 收件人：Chen Lei <chenl3396@gmail.com>
> 抄送：Teresa Chiao <tchiao@om3capital.com>
>
> Charles- I spoke with our counsel today regarding using your entities in lieu of Bixin's.
>
> As we discussed in the last weeks, Bixin and Mr. Wu Gang are at risk for triggering an anti-money laundering investigation in Europe due, in part, to the KYC and documentary evidence issues we've been highlighting since Q3 last year. In fact, this may have already happened from the banking side after the previous and subsequent rejections.
>
> This outcome is something we all desperately want to avoid because Bixin, Alopex, myself, and you will all be roped into an investigation. I do not believe there would be ANY path to something resembling success if this happens. Unfortunately, this is just where we are right now.
>
> If we are to proceed with your personal company(-ies), Alopex would need to ensure that there are zero conflicts pursuant to our NDA/ NCA with Bixin. Our team can draft the documents necessary, of course, but I want to ensure that you understand that. From what you have conveyed, your success would be tantamount to Bixin's success; but we'd need to ensure all parties are in agreement.
>
> All of this said, if we can avoid regulatory and AML scrutiny and proceed with the two paths we have been discussing--hosting with BDC and purchasing power for a facility with HSO--we have a realistic possibility. This is your best chance at this juncture, in our opinion, and we will do everything we can to help.
>
> I look forward to discussing the above and next steps on our weekly call in a few days.
>
> Thank you and best regards.
>
> --
> Matthew B. Czinger
> Founder & CEO

30.    Moreover, in text conversation between myself and Mr. Chen on June 30, 2022, Mr. Chen explicitly acknowledged that the project set forth in the initial LOE had been terminated by

9

Bixin, and that the General Counsel (Penny Peng) of Bixin Mining was also aware of this termination. Mr. Chen and I then discussed the proposed LOE for the new project that the parties were "work[ing] so hard to get moving":



31.     A draft of the proposed new LOE is attached hereto as **Exhibit A.**

32.     Mr. Chen thereafter repeatedly requested that I transfer portions of Alopex's earned Security Deposit for various purposes, evincing his knowledge that it was in Alopex's possession and control—including to request that part of the Security Deposit was transferred to Advel for escrow on the Reir project (a proposed new project between Alopex and a new party backed by Charles' personal assets and companies after Bixin had stopped its involvement).

33. During the fall of 2022, my discussions with representatives of the Bixin Group focused on the execution of a new engagement letter to replace the Amended LOE to allow the Project to move forward with entities outside of the Bixin Group.

### III.    Alopex Advisors LLC Has Sufficient Assets to Satisfy an Arbitral Award

34. I understand that Petitioners suggest that Alopex will be unable to satisfy an arbitral award because: it (1) once sued a contractual counterparty to recover an advance on a loan it never ultimately received; (2) stated in its arbitral filings that it "bet the company, timewise and opportunity-wise, on Bixin"; (3) has a sparse website; and (4) in April 2024 had outstanding tax liability in New York State of less than $14,000.

35. First, the 2021 lawsuit Alopex filed to recover a small fee from a former business associate was filed as a matter of principle. For that reason, we elected to pursue a fee that was not even worth the cost of the litigation, although the sum at issue was a rounding error for Alopex.

36. Second, the reference to "betting the company" on Bixin in our arbitral filings was a reference to the opportunity costs associated with entering into a Letter of Engagement with Bixin, rather than investing the time and resources poured into Alopex's efforts to negotiate a PPA for Bixin into another venture. Alopex Advisors, LLC has multiple other revenue streams, as described below. That is precisely why we mutually negotiated the Security Deposit. The cost of the lost opportunity, as well as the follow on effects of having been associated with Bixin, has far eclipsed four million US dollars.

37. Third, the suggestion that Alopex must not have other business ventures because it does not have an expansive public-facing website is spurious. Alopex develops business through relationships, personal connections, and results. We rely on referrals from friends and colleagues and have no desire to attract business from strangers through web searches—our website has been

intentionally sparse for over a decade of operation. A detailed website says little about the quality of the business. For instance, Bixin may have an interactive website, but it appears to be a shell company without any assets or current employees and, in fact, only a former employee (Mr. Chen) appeared at the arbitration.

38. Fourth, I was not aware of the tax warrant against Alopex Advisors, LLC until Petitioners moved for a writ of attachment and have since submitted payment for that liability.

39. Contrary to Petitioners' unsupported speculation, the reality is that Alopex would be able to satisfy any arbitral award that might be issued in the Hong Kong proceedings. I am loathe to provide extensive details about Alopex's business for fear that Petitioners will use this information to inflict harm on me and my company, but there is no question that Alopex has access to well above $4 million in assets, as Petitioners should have already known from our prior business relationship.

40. As has been explained to Petitioners, the account they seek to attach is, as a matter of general practice for security purposes, only used for incoming and outgoing wire transfers and Alopex's significant assets are held elsewhere.

41. For example, as supported by the letter from KPMG attached hereto as **Exhibit B**, Alopex Advisors LLC's indirect subsidiary in Iceland ("Icelandic Subsidiary") currently holds approximately $1.3 Million in cash on hand in its bank account at Arion Bank, located in Iceland. That Icelandic Subsidiary's EBITDA is forecasted to exceed $5 Million year-over-year between 2024 and 2027, meaning at least $15 million over the next three years.

42. In addition, Alopex would be able to satisfy an award through the sale of a Piper M600 SLS worth approximately $3 million, as supported by the letter from Isaac Capua attached hereto as **Exhibit C.** That asset is owned by a subsidiary of Alopex Advisors, LLC. As confirmed

via a title search from Aero-Space Reports performed on December 19, 2024, there are no liens and/or encumbrances on the aircraft. Further, Petitioners should already be aware of this asset, as Mr. Chen travelled on this aircraft with me previously.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 20, 2024, in New York, New York.

_____
Matthew Czinger